# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| BRITTNEY MAINS, | ) | CASE NO. 1:18CV01380 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

Plaintiff, Brittney Mains ("Plaintiff" or "Mains"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying her applications for a Period of Disability ("POD"), Disability Insurance Benefits

("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction[2]

pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the Commissioner's final decision is VACATED and

REMANDED for further proceedings consistent with this decision.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

[2] On December 26, 2018, this matter was stayed due to the lapse of congressional
appropriations funding the federal government.  *See* General Order 2018-15.  The stay
was thereafter extended pursuant to General Order 2019-1.  As the government shutdown
has ended, the stay imposed by General Orders 2018-15 and 2019-1 is hereby lifted.

# I. PROCEDURAL HISTORY

In July 2014, Mains filed an application for POD, DIB, and SSI alleging a disability onset date of September 1, 2013 and claiming she was disabled due to systemic lupus erythematosus, rheumatoid arthritis, Sjogren's syndrome, hemiplegic migraine headaches, Raynaud's phenomenon, Factor V Leiden, and anxiety. (Transcript ("Tr.") at 370, 372, 414.) The applications were denied initially and upon reconsideration, and Mains requested a hearing before an administrative law judge ("ALJ"). (Tr. 241, 245, 254, 257, 259.)

On October 6, 2017, an ALJ held a hearing,[3] during which Mains, represented by counsel, and an impartial vocational expert ("VE") testified. (Tr. 58.) On December 21, 2017, the ALJ issued a written decision finding Mains was not disabled. (Tr. 12.) The ALJ's decision became final on April 26, 2018, when the Appeals Council declined further review. (Tr. 1.)

On June 19, 2018, Mains filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 13, 15.) Mains asserts the following assignments of error:

> (1) Whether the ALJ erred in failing to assign controlling or great weight to the opinion of Ms. Mains' treating rheumatologist;
>
> (2) Whether the ALJ failed to provide good reasons for giving less than great weight to the opinion of Ms. Mains' treating psychiatrist; and
>
> (3) Whether the limitations from Ms. Mains' hemiplegic and chronic migraines were adequately evaluated by the ALJ.

(Doc. No. 13.)

---

[3] Two prior hearings were held in this matter: one on August 16, 2016 and another on November 29, 2016. (Tr. 44, 119.) The August 2016 hearing was continued in order for Mains to obtain counsel. (Tr. 50-57.) The November 2016 hearing was conducted by a different ALJ than the ALJ which ultimately issued the decision. (Tr. 121.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Mains was born in September 1985 and was thirty-two years-old at the time of her administrative hearing, making her a "younger" person under social security regulations.  (Tr. 28.)  *See* 20 C.F.R. §§ 404.1563(c) & 416.963(c).  She has a high school education and is able to communicate in English.  (*Id.*)  She has past relevant work as a wire preparation and machine tender, salesperson, cashier, and companion.  (Tr. 27-28.)

### B.    Medical Evidence[4]

#### 1.    Mental Impairments

On January 27, 2015, Mains underwent a neuropsychological consultation with neuropsychologist Philip S. Fastenau, Ph.D.  (Tr. 598.)  She reported forgetfulness and memory deficits.  (*Id.*)  She  indicated her mother had taken over her finances due to her forgetfulness. (*Id.*)  Mains also described anxiety, manifested by checking behaviors.  (*Id.*)  During the examination, Mains' affect was restricted, but she was alert and oriented and had normal insight and judgment.  (Tr. 599.)

Dr. Fastenau administered a battery of tests on Mains during the evaluation.  (Tr. 600.) Mains was cooperative during testing, but her "level of task engagement varied considerably across tests," causing her test results to be an underestimate of "her true cognitive abilities."  (Tr. 599.)  Test results indicated normal scores in memory testing, low scores in concentration, and "psychomotor slowing across many measures."  (Tr. 600.)  Based upon this testing, Dr. Fastenau

---

[4]  The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' briefs.

concluded there was "no compelling evidence of neurologically-based memory deficits or other cognitive deficits," but noted Mains "presented with severe levels of depression and anxiety symptoms." (*Id*.) The doctor recommended cognitive behavioral intervention and stress management training. (*Id.*)

Mains subsequently began to treat with psychiatrist Jennifer Brandstetter, M.D., on March 31, 2015. (Tr. 619.) She denied depression, but endorsed poor sleep, low energy, guilt, and poor concentration. (*Id*.) Mains described severe anxiety, manifested by not leaving her home, frequently rearranging furniture in the middle of the night, and panic attacks. (*Id*.) On examination, Mains' speech was normal, but she was mildly anxious and had obsessive thought content. (Tr. 622.) Her attention was intact but her judgment and insight were limited. (Tr. 623.) Dr. Brandstetter diagnosed anxiety and depression and prescribed Escitalopram and Quietiapine. (Tr. 624, 625.)

Mains returned to Dr. Brandstetter on April 28, 2015, reporting improved mood and sleep. (Tr. 614.) She continued to experience rage, paranoia, and anxiety. (*Id*.) She was mildly anxious on examination, with limited judgment and insight. (Tr. 616.) On May 5, 2015, Dr. Brandstetter filled out a form prepared by the Social Security Administration on behalf of Mains. (Tr. 611-612.) She listed Mains' diagnoses as unspecified anxiety disorder and unspecified depressive disorder. (Tr. 612.) The doctor noted Mains had undergone neuropsych testing which confirmed a "memory/concentration impairment thought to be secondary to depression/anxiety." (*Id*.)

On January 29, 2016, Mains visited Dr. Brandstetter, reporting increased migraines and lupus flares. (Tr. 950.) She continued to have irritability and panic attacks. (*Id*.) Mains

4

endorsed a mild improvement in her mood. (*Id*.) On examination, she was alert and oriented, but anxious with limited insight and judgment. (Tr. 952.) Dr. Brandstetter adjusted Mains' medications and referred her for therapy. (Tr. 954.)

Mains reported improved sleep but continued anxiety on February 26, 2016. (Tr. 956.) She was alert and oriented and her attention was intact. (Tr. 959.) However, Dr. Brandstetter noted Mains had passive suicidal ideation with limited judgment and insight. (*Id*.) On April 22, 2016, Mains' anxiety and mood had improved, but she still avoided large groups of people. (Tr. 961.) On examination, her attention was intact, but her judgment and insight were limited. (Tr. 964.)

Mains returned to Dr. Brandstetter on June 10, 2016, describing increased anxiety secondary to her worsening physical health. (Tr. 966.) She reported going on walks to alleviate her stress. (*Id*.) On examination, Mains' attention was intact, but her judgment and insight limited. (Tr. 968.) On July 22, 2016, Mains again reported worsening anxiety and obsessive thoughts, as well as passive suicidal ideation. (Tr. 971, 974.) Dr. Brandstetter prescribed Venlafaxine. (Tr. 974.)

On October 18, 2016, Mains' symptoms had improved with the recent medication change. (Tr. 976.) However, Mains continued to have "significant agoraphobia" and catastrophic thought content. (*Id*.) Dr. Brandstetter filled out a form entitled "Medical Source Statement: Patient's Mental Capacity" on behalf of Mains. (Tr. 935-936.) She found Mains could rarely perform the following activities:

- maintain attention and concentration for extended periods of two-hour segments;

- respond appropriately to changes in routine settings;

- maintain regular attendance and be punctual within customary tolerance;

- deal with the public;

- relate to co-workers;

- interact with supervisors;

- work in coordination with or proximity to others without being distracted;

- complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; and

- socialize.

(*Id*.) She determined Mains could occasionally perform the following activities:

- work in coordination with or proximity to others without being distracting;

- deal with work stress;

- relate predictably in social situations; and

- leave home on her own.

(*Id*.) Dr. Brandstetter opined Mains could frequently behave in an emotional stable manner.

(*Id*.) She concluded Mains could constantly:

- follow work rules;

- use judgment;

- function independently without redirection;

- understand, remember, and carry out simple, detailed, and complex instructions;

- maintain appearance; and

- manage funds/schedules.

(*Id.*)

On March 21, 2017, Mains indicated she was having panic attacks 1-2 times a week, not leaving her home, and exhibiting increased "checking behaviors." (Tr. 1496.) Dr. Brandstetter increased Mains' medications. (Tr. 1503.) Mains reported improvement with her increased dosage on April 27, 2017. (Tr. 1488.) She continued to have trouble in crowds, but made good eye contact and her attention was intact. (Tr. 1488, 1493.) Her insight and judgment continued to be limited. (Tr. 1493.)

On July 19, 2017, Mains began to attend counseling at Signature Health. (Tr. 1522.) During her diagnostic assessment with counselor Jan Lemmer-Graber, LSW, Mains was distractable and anxious, with an intact memory and a logical thought process. (Tr. 1527, 1528.) Ms. Lemmer-Graber diagnosed generalized anxiety disorder. (Tr. 1523.) Mains saw counselor Kim Bauer, LPC, on August 24, 2017. (Tr. 1510.) She described the various stressors and physical ailments which impacted her mood. (Tr. 1513.) During the counseling session, she made good eye contact and had normal speech. (Tr. 1511.)

On September 5, 2017, Mains returned to Dr. Brandstetter, reporting increased stress due to her health. (Tr. 1479.) She indicated high levels of anxiety, but a stable mood. (*Id.*) Dr. Brandstetter observed Mains continued to have catastrophic thought content and limited judgment and insight. (Tr. 1483.) Mains was alert and oriented, with no delusions. (*Id.*) Dr. Brandstetter added Latuda to Mains' medication regimen. (Tr. 1487.)

## 2.    Physical Impairments

In October 2004, at the age of 19, Mains began to treat with neurologist Edward Westbrook, M.D., for hemiplegic migraines.  (Tr. 476.)  At that time, Mains had already had about 100 hemiplegic migraine attacks in her lifetime.  (*Id*.)  Mains reported loss of speech, vertigo, confusion, and vomiting during these attacks.  (*Id*.)  She indicated she had trouble working in front of a computer and spent most of the day in the dark.  (*Id.*)  Mains saw Dr. Westbrook again in May 2005, reporting increased headaches, averaging 2-3 times a week for 2-3 hours at a time.  (Tr. 475.)  She reported two hemiplegic spells since March 2005.  (*Id*.)  Dr. Westbrook prescribed Neurontin.  (*Id*.)

In April 2006, Mains was still having 2-3 headaches a week.  (Tr. 474.)  She described an episode where she was unable to see out of her right eye, along with right-sided numbness and difficulty talking.  (*Id*.)  Dr. Westbrook prescribed Neurontin and Verapamil.  (*Id*.)  Mains subsequently lost her health insurance and was unable to return to Dr. Westbrook until April 2009.  (Tr. 473.)  At that time, she was doing well and working at a shoe store.  (*Id.*)  However, Mains also reported progressively severe headaches, right-sided facial numbness, butterfly rash, and finger pain.  (*Id.*)  Mains suspected her lupus was active again.  (*Id.*)

On June 21, 2010, Mains reported a two-month long headache which was impacting her ability to function and attend work.  (Tr. 471.)  Mains described hemiplegic symptoms, including an inability to see or talk.  (*Id*.)  Dr. Westbrook observed Mains was highly sensitive to the sun and had a sun rash on her arms and face.  (*Id*.)  The doctor listed Mains' hemiplegic migraines as "uncontrolled."  (*Id*.)

Mains visited primary care doctor Constance Anami, M.D., on February 18, 2013, for a painful skin rash on the left side of her body. (Tr. 485.) Dr. Anami prescribed Ultram, Zovirax, and Elavil. (Tr. 486.) From April 3 through April 5, 2013, Mains was hospitalized for an infected tattoo and cellulitis. (Tr. 636.) At that time, her lupus was stable and without flares. (*Id.*)

On July 12, 2013, Mains presented to the emergency room with left toe pain after accidentally kicking a bed. (Tr. 528.) X-rays revealed a fracture in her fifth left toe. (Tr. 530.) She was prescribed Percocet and discharged. (*Id.*)

On July 22, 2013, Mains was evaluated by rheumatologist Van Warren, M.D. regarding the pains in her joints, hands, knees, and feet. (Tr. 509.) She indicated she had discontinued her lupus medications while pregnant and had not resumed taking them. (*Id.*) She reported a rash on her face and chest, photosensitivity, mouth sores, pain, and swelling in joints. (*Id.*) On examination, Mains had slight soft tissue thickening in her hands and left wrist, mild tenderness in her knees, and a rash on her upper arms and chest. (Tr. 510.) Dr. Warren prescribed Plaquenil and Naproxen and ordered updated labwork. (*Id.*)

Mains returned to Dr. Warren on October 14, 2013, reporting popping in her knees and a rash. (Tr. 502.) On examination, she had a rash and crepitus in her left knee. (Tr. 504.) Dr. Warren ordered updated labwork and prescribed a course of steroids. (Tr. 507.)

On November 8, 2013, Mains visited primary care doctor Mohammad Reza, M.D., for rib pain, vomiting, and diarrhea. (Tr. 1086.) On examination, her bowel sounds and gait were normal and her sensation was grossly intact. (Tr. 1090.) Dr. Reza prescribed Naprosyn and instructed Mains to visit the emergency room if her symptoms persisted. (Tr. 1091.)

Mains visited the emergency room on March 19, 2014 for a migraine, left-sided numbness, and vomiting.  (Tr. 532.)  A CT of her head was negative for any acute abnormalities.  (Tr. 765.)  Mains was provided with IV medications and her condition improved.  (Tr. 535.)  She followed up with Dr. Reza on April 3, 2014, reporting frequent headaches.  (Tr. 1079.)  Dr. Reza referred her to a neurologist.  (Tr. 1084.)

On July 8, 2014, Mains saw Dr. Warren for knee pain, rash, and intermittent episodes of diaphoresis (i.e., heavy sweating).  (Tr. 499.)  On examination, Mains had a rash on her arms and mild diffuse soft tissue swelling in her hands and wrists.  (Tr. 500.)  She had no joint effusion.  (*Id.*)  Dr. Warren added Methotrexate to Mains' medication regimen.  (Tr. 501.)

Mains presented to the emergency room on August 1, 2014 with acute leg, ear, and throat pain.  (Tr. 537.)  An ultrasound was negative for deep vein thrombosis, but a throat culture was positive for strep.  (Tr. 540.)  During her emergency room visit, she reported joint pain and was tachycardic, so she was admitted to the hospital for observation.  (*Id.*)  During her hospitalization, she received treatment for strep and an ear infection.  (Tr. 545.)

On September 3, 2014, Mains returned to Dr. Westbrook, reporting frequent migraines, occurring at least once a month with associated left arm numbness and difficulty with speech.  (Tr. 831.)  In addition to her migraines, Mains also described a daily headache.  (*Id*.)  Dr. Westbrook prescribed Verapamil.  (Tr. 833.)

Mains saw Dr. Warren on October 7, 2014, describing pain in her neck, hips, legs, and knees.  (Tr. 923.)  She also reported recent memory problems.  (*Id.*)  On examination, Mains had good range of motion in her upper and lower extremities, negative straight leg raises, and a normal gait.  (Tr. 924.)  However, she had slight soft tissue thickening in her hands and

tenderness in her upper back, shoulders, eyes, and hands.  (*Id.*)  Dr. Warren prescribed Topamax and referred Mains for neuropsychiatric testing.  (Tr. 925.)

On November 12, 2014, Mains reported Topamax initially improved her headaches, but they had returned.  (Tr. 826.)  She described burning and numbness in her toes and hands, along with memory deficits and forgetfulness.  (*Id.*)  On examination, Mains had decreased sensation to the left side of her face and "glove and stocking" pattern of decreased sensation in her hands and feet.  (Tr. 828, 829.)  Her gait and motor exam were normal.  (*Id.*)  Dr. Westbrook determined her presentation was "concerning" for "active lupus with neurological complication." (Tr. 830.)  He ordered a brain MRI and EEG.  (*Id.*)  Both the brain MRI and EEG were unremarkable.  (Tr. 787, 788.)

Mains followed up with Dr. Westbrook on November 26, 2014, with continued burning and numbness in her toes and hands.  (Tr. 821.)  On examination, Mains had decreased sensation on both sides of her face, her hands, and her feet.  (Tr. 824.)  Her motor exam and gait were normal.  (*Id.*)  Her labwork was negative for a lupus exacerbation.  (Tr. 825.)  Dr. Westbrook admitted Mains to the hospital and provided her with a Depakote infusion for her intractable headache.  (Tr. 825, 585.)  During her hospitalization, a spinal tap was negative for any inflammatory or malignant cells.  (Tr. 596.)  She also was placed on steroids.  (Tr. 585.)

On January 7, 2015, Mains the Depakote infusion alleviated her severe headache.  (Tr. 816.)  However, she continued to have a mild daily headache.  (*Id.*)  Dr. Westbrook noted Mains' hospital workup was negative for abnormalities.  (Tr. 819.)  On examination, Mains had decreased sensation, but a normal gait and motor examination.  (*Id.*)

Mains subsequently visited the emergency room on February 22, 2015 for a migraine and nausea. (Tr. 727.) She received another Depakote infusion for her symptoms. (*Id.*)

Mains visited Dr. Warren on March 4, 2015, reporting numbness in her fingers, burning in her arms, and generalized musculoskeletal pain. (Tr. 903.) On examination, she had good range of motion in her arms and legs and negative straight leg raises. (Tr. 904.) She continued to have a rash on her face. (*Id.*) Dr. Warren increased Mains' Methotrexate dosage and referred her to a psychiatrist. (*Id.*)

On May 22, 2015, Mains presented to the emergency room with nausea, vomiting, and diarrhea. (Tr. 718.) She was provided with Norco and Zofran. (Tr. 723.) Mains reported persistent diarrhea to Dr. Warren on June 10, 2015. (Tr. 999.) She also described episodes of confusion, palpitations, and lightheadedness. (*Id.*) Dr. Warren noted her Topamax was possibly contributing to her memory disturbance. (*Id.*) Her musculoskeletal examination was normal at that time. (Tr. 1002.)

Mains also saw neurologist Ayham Malkhachroum, M.D., on June 10, 2015. (Tr. 811.) Dr. Malkhachroum reviewed Mains' long history of migraines and associated light sensitivity. (*Id.*) On examination, Mains was oriented, with intact memory and normal speech. (Tr. 813.) Her motor examination, coordination, and gait were all normal. (Tr. 814.) While Mains' sensory examination was abnormal, it was "not consistent with anatomical distribution." (*Id.*) Dr. Malkhachroum prescribed Topamax and Lorazepam. (*Id.*)

On September 28, 2015, Mains visited the emergency room for epigastric pain and vomiting. (Tr. 702.) Gastroenterologist Mazen Issa, M.D., ordered an upper endoscopy. (*Id.*) This testing revealed stasis changes in the mid to lower esophagus, but was otherwise normal.

(Tr. 891.)  Dr. Issa prescribed Protonix and Procardia.  (*Id.*)  On September 30, 2015, Mains saw Dr. Warren, reporting improved chest pain but continued hip and knee pain.  (Tr. 889.)

Mains followed up with Dr. Westbrook on October 14, 2015, reporting severe migraines 1-2 times a month, with associated nausea, vomiting, and unilateral numbness.  (Tr. 801.)  She described numbness and tingling in her fingers.  (*Id.*)  On examination, Mains' sensation, motor strength, and gait were all normal.  (Tr. 804.)  Dr. Westbrook recommended Mains receive Botox injections for her headaches since they were not responding to medication.  (Tr. 805.)

On November 4, 2015, Mains visited neurologist Steven Gunzler, M.D., reporting hemiplegic headaches 2-3 times a month, along with daily headaches.  (Tr. 796.)  On examination, she was wearing sunglasses and had increased headache with eye movement testing.  (Tr. 799.)  Her gait was normal and she had no facial droop.  (*Id.*)

Mains subsequently visited the emergency room three times within a three week span for migraines.  On November 21, 2015, Mains presented to the emergency room for a migraine and nausea.  (Tr. 685.)  She indicated light exacerbated her pain.  (*Id.*)  On December 15, 2015, she again visit the emergency room for a headache.  (Tr. 681.)  Mains' received Floricet and Topamax and her condition improved.  (Tr. 683-684.)  However, she returned to the emergency room that same day because her headache returned.  (Tr. 673.)

On January 4, 2016, Mains underwent her first Botox injection for treatment of her migraines.  (Tr. 846.)  This injection took 5-6 days to alleviate her symptoms, but it did eventually stop her hemiplegic symptoms for several months.  (Tr. 844.)

Mains followed up with Dr. Warren on February 17, 2016, reporting joint pain, fever, and diarrhea.  (Tr. 876.)  On examination, she had a good range of motion in her joints without

13

effusion and slightly puffy hands.  (*Id.*)  Dr. Warren continued to prescribe Methotrexate.  (Tr. 878.)

Mains underwent her second Botox injection on April 4, 2016.  (Tr. 844.)  A month later, on May 5, 2016, Mains presented to the emergency room with a migraine and vomiting.  (Tr. 664.)  She received Norco and Zofran for her symptoms.  (Tr. 667.)

On May 25, 2016, Mains visited neurologist Bayan Almarwari, M.D.  (Tr. 791.)  She reported the numbness in her hands and feet were worsening to the point where she occasionally could not feel the ground.  (Tr. 791.)  She denied any significant weakness in her hands, but reported dropping cups three times the month prior.  (*Id.*)  On examination, her facial sensation and motor examinations were normal.  (Tr. 794.)  Her sensory examination was abnormal, with a "glove and socking pattern" of diminished sensation in her hands and feet and diminished vibratory sensation in her big toes.  (Tr. 795.)  Mains reported despite some improvement from the Botox injections, she continued to have three severe headache attacks a month.  (*Id.*)  Dr. Almarwari advised Mains it would be difficult for her to "achieve a headache free status."  (*Id.*)

Mains followed up with Dr. Warren on June 15, 2016, describing elbow and knee pain and rashes with sun exposure.  (Tr. 865.)  She also had numbness in her hands and feet, difficulty holding objects, and poor balance.  (*Id.*)  Dr. Warren noted Mains was having "persistent migraines despite Botox injections."  (*Id.*)  He referred her for an EMG.  (*Id.*)  The next day, Mains visited the emergency room with a migraine and vomiting.  (Tr. 659.)

On July 13, 2016, Mains received a third Botox injection.  (Tr. 841.)  At that time, she was still having three severe headaches each month, along with milder headaches every 1-2 days.  (*Id.*)  Mains subsequently visited the emergency room on August 19, 2016, reporting a 13-hour

14

long migraine.  (Tr. 654.)  She returned to the emergency room on August 21, 2016, after lacerating her right finger while washing the dishes.  (Tr. 649.)

On October 3, 2016, Dr. Warren filled out a form entitled "Medical Source Statement: Patient's Physical Capacity" on behalf of Mains.  (Tr. 1077-1078.)  He found Mains was limited to

- lifting 15 pounds occasionally and 10 pounds frequently;

- standing/walking 3 hours in an 8-hour workday, 2 hours without interruption;

- rarely climbing, balancing, kneeling, and crawling;

- occasionally crouching, kneeling, reaching, pushing, pulling and performing fine manipulation; and

- frequently performing gross manipulation.

(*Id*.)  Dr. Warren noted Mains had multiple environment restrictions, including from heights, moving machinery, and temperature extremes.  (Tr. 1078.)  He noted she had been prescribed a cane, experienced a moderate degree of pain, and required the ability to alternate between sitting, standing, and walking.  (*Id.*)  Dr. Warren concluded Mains' pain would result in absenteeism and she would require one additional unscheduled rest period each day.  (*Id.*)

Mains underwent her fourth Botox injection on October 19, 2016.  (Tr. 1370.)  She indicated the prior injection stopped her hemiplegic symptoms.  (*Id.*)  However, she continued to have 2-3 severe headaches each month and a milder headache every two days.  (*Id.*)

On November 2, 2016, Mains visited Dr. Warren, for intermittent chills and swelling over her left parotid gland.  (Tr. 1105.)  On examination, she had no joint effusion, but tenderness in her left parotid gland, puffiness in her fingers, and mild tenderness in her knees.

(*Id.*)  Dr. Warren felt the glandular swelling was related to Mains' Sjogren's syndrome and referred her to a specialist.  (Tr. 1105, 1106.)

Mains returned to Dr. Westbrook on November 9, 2016, reporting numbness in her hands and feet.  (Tr. 1382.)  She indicated the Botox injections were helpful, but Dr. Westbrook observed Mains had headaches 15 days each month and required emergency room care on a monthly basis.  (*Id.*)  On examination, Mains' sensory examination was abnormal in her hands, feet, and big toes.  (Tr. 1386.)  Dr. Westbrook referred Mains to Dr. Deborah Reed, a headache specialist, for further evaluation of her "severe migraine attacks."  (*Id.*)

Mains visited Dr. Reed on November 11, 2016, reporting headaches since the age of 16 and forgetfulness for the past 3-5 years.  (Tr. 1373.)  Mains reported odors, light, chocolate, red dyes, heat, and the summer months triggered her migraines.  (*Id.*)  On examination, Mains had intact memory, attention, and concentration.  (Tr. 1376.)  Mains' motor examination was abnormal and revealed left hemiplegia.  (Tr. 1377.)  Mains' muscle tone, coordination, and gait were all normal.  (*Id.*)  Dr. Reed prescribed Trokendl and Toradol and ordered a cervical MRI.  (Tr. 1380.)  This MRI testing was denied by insurance.  (Tr. 1411.)

On February 1, 2017, Mains visited Dr. Warren with knee discomfort and eye and mouth dryness.  (Tr. 1457.)  Mains had a good passive range of motion in her upper and lower extremities and mild tenderness in the left knee.  (*Id.*)  Dr. Warren renewed Mains' Methotrexate prescription.  (*Id.*)  Because her parotid glands continued to be enlarged bilaterally, Dr. Warren ordered a CT scan of Mains' face.  (*Id.*)  The CT scan confirmed mild to moderate atrophy of the bilateral parotid glands and large lesions in the right and left parotid glands.  (Tr. 1422-1423.)  These findings were consistent with Sjogren's syndrome.  (Tr. 1423.)

On May 15, 2017, Mains visited the emergency room for a migraine with associated vomiting and weakness. (Tr. 1431.) On examination, she was alert and oriented, with a normal musculoskeletal examination. (Tr. 1434.) Her brain CT scan was negative. (Tr. 1436.) The emergency room physicians provided Mains with medications and advised her to follow up with her headache specialist. (Tr. 1437.)

## C. State Agency Reports

### 1. Mental Impairments

On August 26, 2014, Mains underwent a consultative examination with psychologist Richard N. Davis, M.A. (Tr. 570.) She reported difficulty maintaining employment due to her numerous physical problems. (*Id*.) She denied difficulty getting along with others, but indicated she was "frequently depressed and anxious." (Tr. 571.) She reported crying spells and occasional anxiety attacks. (Tr. 572, 573.) Mains presented with "appropriate enough affect for the most part" and had the "ability to think logically, use common sense and judgment." (Tr. 573-574.)

Based upon this examination, Mr. Davis provided the following opinion regarding Mains:

**Describe the claimant's abilities and limitations in understanding, remembering and carrying out instructions.**

This individual certainly has the ability to understand, remember and carry out more than just simple instructions.

**Describe the claimant's abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace, to perform simple tasks and to perform multi-step tasks.**

She paid attention and concentrated and did those things in my office that I asked her to do. I suspect that this individual would be able to multi-task.

17

**Describe the claimant's abilities and limitations in responding appropriately to supervision and to coworkers in a work setting.**

She did not indicate that she had trouble getting along with fellow workers or supervisors when she was employed.

**Describe the claimant's abilities and limitations in responding appropriately to work pressures in a work setting.**

She was able to deal with the stresses and the pressures of employment as along as her physical problems allow her to do the job.

(Tr. 573.)

On September 27, 2014, state agency physician David Dietz, Ph.D., reviewed Mains' medical records and completed a Psychiatric Review Technique ("PRT"). (Tr. 184-185.) He concluded Mains had (1) no restrictions in activities of daily living; (2) no difficulties in maintaining social functioning; (3) mild difficulties in maintaining concentration, persistence, and pace; and (4) no episodes of decompensation. (*Id.*) Dr. Dietz concluded "although the medical evidence indicates that [claimant] does have a mental [medically determinable impairment], she is not expected to have more than mild limitations resulting from her condition. (Tr. 185.)

On April 20, 2015, Mains underwent another consultative examination with psychologist Richard N. Davis, M.A. (Tr. 605.) She reported she was now under the care of a psychologist and was taking medications for anxiety, sleep, headaches, and depression. (Tr. 606.) Mr. Davis administered the WAIS and Mains obtained a full scale IQ of 82, placing her in the low average range. (Tr. 607-608.) She appeared "to do less well on those subtests that required her to achieve by working quickly" and her "strong points appear[ed] to be in her verbal skills and memory." (Tr. 608.) Mr. Davis also administered the Wechsler Memory Scale, which revealed

Mains' "memory suffer[ed] somewhat from a delay." (*Id.*) He concluded Mains would not "have difficulties in employment situations that were within her intellectual range and of interest to her." (*Id.*) He observed Mains saw "herself as being less than employable due to things wrong with her physically interfering with her being able to be a good employee." (*Id.*)

On May 14, 2015, state agency physician Karla Voyten, Ph.D., reviewed Mains' medical records and completed a Psychiatric Review Technique ("PRT"). (Tr. 214-215.) She concluded Mains had (1) mild restrictions in activities of daily living; (2) mild difficulties in maintaining social functioning; (3) moderate difficulties in maintaining concentration, persistence, and pace; and (4) no episodes of decompensation. (Tr. 215.) Dr. Voyten also completed a Mental Residual Functional Capacity ("RFC") Assessment. (Tr. 218-220.) She concluded Mains was moderately limited in her ability to (1) maintain attention and concentration for extended periods; (2) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and (3) respond appropriately to changes in the work setting. (Tr. 219.) She found Mains was not significantly limited in her abilities to (1) carry out very short and simple instructions; (2) carry out detailed instructions; (3) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (4) sustain an ordinary routine without special supervision; (5) work in coordination with or in proximity to others without being distracted by them; (6) make simple work-related decisions; (7) be aware of normal hazards and take appropriate precautions; (8) travel in unfamiliar places or use public transportation; and (9) set realistic goals or make plans independently of others. (219-220.) Dr. Voyton explained the basis of her decision as follows:

[Claimant] reports memory problems but scores on memory testing were in the low average range.

\*\*\*

The [claimant] can perform static tasks without strict demands on production or pace.

\*\*\*

The [claimant] would work best in an environment where there are infrequent changes in routine.

(*Id.*)

### 2. Physical Impairments

On September 25, 2014, state agency physician Bradley J. Lewis, M.D., reviewed Mains' medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment. (Tr. 186-189.) Dr. Lewis determined Mains could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for about 6 hours in an 8-hour workday; and sit for about 6 hours in an 8-hour workday. (Tr. 186-187.) He further found Mains was limited to frequent use of hand controls, could occasionally climb ladders, ropes, and scaffolds, and frequently kneel, crouch, and crawl. (Tr. 187.) Dr. Lewis also limited Mains to frequent handling and fingering with her hands. (Tr. 188.)

On March 5, 2015, state agency physician Maureen Gallagher, D.O., reviewed Mains' medical records and completed a Physical RFC Assessment. (Tr. 216-218.) She adopted the findings of Dr. Lewis. (*Id.*)

### D. Hearing Testimony

During the October 6, 2017 hearing, Mains testified to the following:

- She lives with her four children and her brother. (Tr. 65.) She has her GED and obtained a certificate in medical billing and coding. (Tr. 66.) She does not drive because of hand numbness and weakness. (Tr. 66-67.)

- Her last job was in a factory. (Tr. 69.) She worked as an assembler, but she struggled to perform this job due to the loss of feeling in her hands. (Tr. 70.) She also worked as a machine operator, but received accommodations in this position because she knew the owner. (Tr. 71-72.) She eventually lost her job because she was sick so often. (Tr. 72-73.) Prior to working in the factory, she worked as a salesperson at a shoe store and a companion for a home health service. (Tr. 74-80.)

- She has Lupus and Sjogren's and both diseases have progressively worsened over time. (Tr. 68.) She has neuropathy, lethargy, and pain. (Tr. 69.) She also has frequent migraines, which are triggered by lights, noise, and heat. (Tr. 73.)

- She has flares of lupus, during which she will have a fever, fatigue, and pain. (Tr. 83.) During a "good month," she will only have two flares, but she can have up to four a month. (Tr. 85-86.) She has a facial rash and joint pains from her lupus. (Tr. 101-102.)

- She has daily headaches, along with hemiplegic migraines. (Tr. 83.) The medications she takes for her migraines make her tired and "loopy." (*Id*.) When she has a hemiplegic migraine, it often takes days to recover. (Tr. 85.) She will experience numbness on the left side of her body, her face wil droop, and she will have difficulty speaking. (Tr. 100.)

- She has neuropathy in her hands, feet, and legs. (Tr. 87.) She has difficulty walking up steps and on carpeting. (*Id*.) She has fallen on steps and she uses a rail in the shower because she has slipped and fallen. (*Id*.) Because her hands are numb she has cut herself doing the dishes and cooking. (Tr. 88.) She has required stitches multiple times in her hands. (*Id*.)

- She has anxiety around others. (Tr. 91.) She has difficulty going to the grocery store and to her son's sporting events. (*Id*.) She spends most her day sleeping. (Tr. 97.) She helps her children with their homework when they get home from school. (Tr. 97-98.) Her children help out around the house. (Tr. 98.)

The VE testified Mains had past work as a wire preparation and machine tender, a sales person, a cashier, and companion. (Tr. 111.) The ALJ then posed the following hypothetical question:

21

All right. Okay. Mr. Davis, please assume an individual of claimant's age, education and work experience and please assume that this individual can perform the full range of light work; frequently push and pull with bilateral, lower extremities; frequently, bilateral use of hand controls; occasionally climb ladders, ropes, and scaffolds; frequently kneel, crouch and crawl; frequent, bilateral handling, fingering and feeling. This person should not be exposed to loud noise and only have frequent exposure to extreme heat. Okay. And that this individual, also, cannot work at a production-rate pace and is limited to occasional, routine workplace changes.

(Tr. 112.)

The VE testified the hypothetical individual would be able to perform Mains' past work as a companion and wire preparation and machine tender. (Tr. 112-113.) The VE further explained the hypothetical individual would also be able to perform other representative jobs in the economy, such as lens matcher (D.O.T. #713.687-030); shipping and receiving weigher (D.O.T. #222.387-014); and final inspector (D.O.T. #727.687-054). (Tr. 114-115.)

### III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits,

a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Mains was insured on her alleged disability onset date, July 12, 2013, and remained insured through December 31, 2018, her date last insured ("DLI.") (Tr. 19.) Therefore, in order

to be entitled to POD and DIB, Mains must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2018.

2.     The claimant has not engaged in substantial gainful activity since July 12, 2013, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.     The claimant has the following severe impairments: systemic lupus erythematosus, inflammatory arthritis, Sjogren's syndrome, migraines, affective disorders, anxiety disorders, peripheral neuropathy, and irritable bowel syndrome (20 CFR 404.1520(c) and 416.920(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.     After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she has additional limitations. The claimant can frequently push and pull with the bilateral lower extremities. She can engage in the frequent use of bilateral hand controls. The claimant can occasionally climb ladders, ropes, and scaffolds. She can frequently kneel, crouch, and crawl. The claimant can perform frequent bilateral handling, fingering, and feeling. She should not be exposed to loud noise. The claimant can have only frequent exposure to extreme heat. In addition, she cannot work at a production-rate pace. She is limited to occasional, routine workplace changes.

6.     The claimant is capable of performing past relevant work as a companion and a wire preparation and machine tender. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.    The claimant has not been under a disability, as defined in the Social Security Act, from July 12, 2013, through the date of this decision (20 CFR 404.1520(f) and 416.920(f).

(Tr. 19-30.)

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another

conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

# VI. ANALYSIS

## A.       Treating Source Opinion – Dr. Warren

In her first assignment of error, Mains argues the ALJ improperly evaluated and weighed the opinion of her treating rheumatologist, Dr Warren. (Doc. No. 13 at 14.) She asserts "Dr. Warren's opinion should have been accorded controlling weight" because Dr. Warren is a specialist, a treating physician, and his opinion is consistent with the treatment notes. (*Id.* at 15.) Mains contends that even "if the ALJ was correct in her decision to not give [Dr. Warren's] opinion controlling weight," the ALJ failed to provide the requisite good reasons for "assigning little weight to Dr. Warren's opinion." (*Id.* at 17.)

The Commissioner maintains the ALJ properly evaluated Dr. Warren's opinion. (Doc. No. 15 at 13.) She asserts "Dr. Warren's familiarity with [Mains] does not free his opinion from scrutiny." (*Id.* at 12.) She argues Dr. Warren's opinion was "inconsistent with clinical findings and examination results" and "basically a 'check-box analysis' with a few fill in the blank questions." (*Id.* at 13, 14.)

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).[5] However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the

---

[5]     Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date. *See* 82 Fed. Reg. 5844 (March 27, 2017).

opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009).

Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed

using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at

408.[6] *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source

opinion controlling weight, then the opinion is weighed based on the length, frequency, nature,

and extent of the treatment relationship, *id*., as well as the treating source's area of specialty and

the degree to which the opinion is consistent with the record as a whole and is supported by

relevant evidence, *id*. § 404.1527(c)(2)-(6).")

    If the ALJ determines a treating source opinion is not entitled to controlling weight,

"the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently

specific to make clear to any subsequent reviewers the weight the adjudicator gave to the

treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc.

Sec.*, 486 F.3d 234, 242 (6th Cir. 2007). *See also Gayheart*, 710 F.3d at 376. The purpose of

this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand

the disposition of their cases,' particularly where a claimant knows that his physician has

deemed him disabled and therefore 'might be bewildered when told by an administrative

bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.*

---

[6]    Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

(quoting *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler,* 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley,* 581 F.3d at 406. Moreover, the "treating physician rule" only applies to *medical opinions*. "If the treating physician instead submits an opinion on an issue reserved to the Commissioner—such as whether the claimant is disabled, unable to work, the claimant's RFC, or the application of vocational factors— [the ALJ] decision need only 'explain the consideration given to the treating source's opinion.'" *Johnson v. Comm'r of Soc. Sec*., 535 Fed. App'x 498, 505 (6th Cir. 2013). The opinion, however, "is not entitled to any particular weight." *Turner*, 381 Fed. App'x at 493. *See also Curler v. Comm'r of Soc. Sec.,* 561 Fed. App'x 464, 471 (6th Cir. 2014).

As noted *supra*, Dr. Warren, Mains' treating rheumatologist, submitted a medical opinion in October 2016. Dr. Warren opined Mains was limited to the following:

- lifting 15 pounds occasionally and 10 pounds frequently;

- standing/walking 3 hours in an 8-hour workday, 2 hours without interruption;

29

- rarely climbing, balancing, kneeling, and crawling;

- occasionally crouching, kneeling, reaching, pushing, pulling and performing fine manipulation; and

- frequently performing gross manipulation.

(Tr. 1077-1078.)  Dr. Warren also found Mains had multiple environment restrictions, including from heights, moving machinery, and temperature extremes.  (Tr. 1078.)  He noted Mains had been prescribed a cane, experienced a moderate degree of pain, and required the ability to alternate between sitting, standing, and walking.  (*Id.*)  Dr. Warren concluded Mains' pain would cause absenteeism and she would require one additional unscheduled rest period each day.  (*Id.*)

At step four of the sequential evaluation, the ALJ considered the opinion evidence from Dr. Warren as follows:

> To the contrary, I assign little weight to the opinion of Van Warren, M.D. (Exhibit 19F).  He suggested the claimant could only lift and carry fifteen pounds occasionally and ten pounds frequently, stand/walk three hours, rarely climb/balance/kneel/crawl, and occasionally stoop/crouch.  He also suggested the claimant could frequently engage in gross manipulation and that her ability to be exposed to heights, moving machinery, and temperature extremes was affected.  Even though he is the claimant's treating physician, his opinion is inconsistent with the relatively normal physical examinations summarized above (e.g. Exhibits 18F/11, 22; 23F/11).  Additionally, his opinion that the claimant needs a cane is inconsistent with the fact that several other medical professionals concluded she was able to ambulate normally without an assistive device (Exhibits 5F/6; 6F/8; 13F/19, 29; 20F/6, 12; 21F/28; 28F/8).

(Tr. 26.)

The Court finds the ALJ failed to properly evaluate Dr. Warren's October 2016 opinion.  As noted above, an ALJ must provide "good reasons" for declining to assign a treating

source opinion controlling weight. While the ALJ did provide reasons for discounting Dr. Warren's opinion, they are not supported by substantial evidence.

In particular, the ALJ discounted Dr. Warren's opinion on the basis it was "inconsistent with the relatively normal physical examinations summarized above." (Tr. 26.) However, despite the ALJ referencing her discussion of the physical examination findings "summarized above," she devoted less than a page of discussion in her review of over 1,000 pages of medical evidence. (Tr. 25-26.) Within this brief and cursory discussion, the ALJ either failed to acknowledge, or mischaracterized, several key pieces of evidence. Indeed, while the ALJ acknowledged Mains often had a rash and swelling in her hands and wrists, she concluded "these findings would not preclude her from performing light work with the upper extremities." (Tr. 25.) The ALJ also noted "normal range of motion in the upper and lower extremities." (*Id.*) However, the ALJ did not mention the repeated findings of decreased sensation in Mains' hands, feet, and face. (Tr. 828, 829, 824, 819, 795, 1386.)

The ALJ also observed that in respect to Mains' "alleged[7] headaches," Botox had "stopped her hemiplegic symptoms and usually improved her milder headaches." (Tr. 25.) The ALJ noted the neurological examinations and EEG findings "typically yielded normal findings." (*Id.*) This minimal discussion fails to recognize that while Botox improved Mains' symptoms, she continued to experience 2-3 severe headaches each month and would still visit the emergency room for care. (Tr. 1370, 654.) Mains eventually had to visit Dr. Reed, a headache specialist, due to her persistent symptoms despite Botox. (Tr. 1373.) The ALJ failed to

---

[7]    The Court is troubled by the ALJ's characterization of Mains' migraines as "alleged headaches," given that Mains has documented evidence of experiencing hemiplegic migraines on a regular basis since she was a teenager. (Tr. 476, 474.)

acknowledge Mains' visit to Dr. Reed entirely. Significantly, during Mains' visit to Dr. Reed, she had left hemiplegia on examination, even without having a headache at the time. (Tr. 1377.)

The ALJ also asserted "no physician has determined [Mains] has problems with photosensitivity," while overlooking the multiples times in which Mains was observed to be sensitive to light not only due to her migraines, but her lupus as well. (Tr. 25, 688, 471, 796, 799, 865.) Finally, the ALJ characterized Mains' treatment as "relatively conservative," without acknowledging or discussing the fact Mains required Methotrexate for treatment of her lupus, countless emergency room visits, several hospitalizations, and saw a neurologist and rheumatologist on a regular basis throughout the relevant period. (Tr. 24, 501, 904, 878, 1457, 532, 727, 718, 685, 681, 673, 664, 636, 540, 825.)

The ALJ does not sufficiently explain how, in light of the above evidence, simply noting a normal range of motion, some improvement with Botox, and a normal EEG supports affording Dr. Warren's opinion "little" weight. The Sixth Circuit has made clear an ALJ's conclusory and unexplained statement a treating physician opinion is inconsistent with the medical evidence of record, does not constitute a "good reason" for purposes of a rejecting an opinion. *See, e.g., Friend v. Comm'r of Soc. Sec.,* 375 Fed. App'x 543, 552 (6th Cir. 2010) ("Put simply, it is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick.").

While the ALJ is not expected to discuss or cite each and every piece of evidence contained in the medical record, the amount of objective findings the ALJ did not discuss when evaluating Dr. Warren's opinion is considerable. As such, this undercuts her reasoning Dr.

Warren's opinion is not supported by evidence. Courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light, and fails to acknowledge evidence that potentially supports a finding of disability. *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir.2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 Fed. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports"). *See also Ackles v. Colvin*, 2015 WL 1757474 at * 6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."), *report and recommendation adopted*, 2015 WL 2142396 (S.D. Ohio May 6, 2015); *Smith v. Comm'r of Soc. Sec.*, 2013 WL 943874 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ "may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding."); *Taylor v. Comm'r of Soc. Sec.*, 2014 WL 1874055 at * 4 (N.D. Ohio May 8, 2014) (stating that it "is clear that an ALJ may not determine the RFC by failing to address portions of the relevant medical record, or by selectively parsing that record—i.e., 'cherry-picking' it—to avoid analyzing all the relevant evidence. This is particularly so when the evidence ignored is from a treating physician.)

Had the ALJ provided a more detailed discussion of the treatment notes prior to weighing Dr. Warren's opinion, this Court may have been able to conduct a more meaningful appellate review. However, the ALJ did not provide a comprehensive discussion of the evidence, and in fact, ignored several important pieces of medical evidence that do not support

her conclusion.  The ALJ cannot cure a deficient explanation by simply reciting some of the evidence, and then follow it with an unexplained conclusion the treating source opinion is inconsistent with the evidence.  *Boughter v. Colvin,* 2016 WL 7670046 at *19 (N.D. Ohio Dec. 12, 2016), *report and recommendation adopted*, 2017 WL 89340 (N.D. Ohio Jan. 10, 2017). *See also Sacks v. Colvin*, 2016 WL 1085381 at * 5 (S.D. Ohio March 21, 2016) ("[A]lthough the ALJ made a general statement about inconsistencies between Dr. Bhatia's opinions and the 'medical evidence of record,' it was just that-a general statement devoid of any specific reference to any portion of the medical evidence. Such conclusory statements do not provide the claimant with any ability to understand their content, nor do they provide a reviewing court with the ability to decide if the ALJ correctly or incorrectly assessed those claimed inconsistencies."), *report and recommendation adopted*, 2016 WL 2858901 (N.D. Ohio May 16, 2016).

In addition, the ALJ fails to discuss Dr. Warren's opinion that Mains' pain symptoms would cause absenteeism and she would require an additional, unscheduled break during the workday.  (Tr. 1078.)  The fact the ALJ fails to provide any analysis or acknowledgment of this limitation is concerning, as Mains' persistent migraines, which would likely cause absences or unscheduled breaks, are well-documented in the treatment notes.  (Tr. 831, 801, 865, 1386.) Indeed, Mains' migraines became so significant during the relevant period she required treatment from a headache specialist, IV infusions, and Botox injections.  (Tr.1386, 1373, 585, 727, 846, 844, 841.)  Because the ALJ did not provide any analysis in relation Dr. Warren's opinion Mains required an additional break and absences, this Court is unable to discern if this portion of the opinion was discounted or overlooked.

The Commissioner suggests Dr. Warren's opinion was "basically a 'check-box analysis' with a few fill in the blank questions." (Doc. No. 15 at 14.) As an initial matter, the ALJ did not provide this rationale when discounting Dr. Warren's opinion. The Commissioner cannot cure a deficient opinion by offering explanations never made by the ALJ. As courts within this District have noted, "arguments [crafted by defense counsel] are of no consequence, as it is the opinion given by an administrative agency rather than counsel's '*post hoc* rationale' that is under the Court's consideration." *See, e.g., Blackburn v. Colvin*, 2013 WL 3967282 at * 8 (N.D. Ohio July 31, 2013); *Cashin v. Colvin*, 2013 WL 3791439 at * 6 (N.D. Ohio July 18, 2013); *Jaworski v. Astrue*, 2012 WL 253320 at * 5 (N.D. Ohio Jan. 26, 2012).

Moreover, the Court does not agree with this characterization of Dr. Warren's opinion. A careful review of Dr. Warren's opinion reveals the form, while containing a series of checks, also contains specific functional limitations regarding Mains' ability to lift, carry, stand, and walk. (Tr. 1077-1078.) Dr. Warren not only lists Mains' physical restrictions, but also identifies specific clinical findings to support his opinion, including the numbness in Mains' hands and feet. (*Id.*) This opinion is not a questionnaire in which a physician "failed to provide any explanation for [his] responses." *Kepke v. Comm'r of Soc. Sec.,* 636 Fed App'x 625, 630 (6th Cir. Jan. 12, 2016) (citing *Price v. Comm'r of Soc. Sec.,* 342 Fed. App'x 172, 176 (6th Cir. 2009).). In addition, Dr. Warren also submitted his treatment notes which contain detailed physical examinations of Mains and provide insight into treatment course. Treatment, as discussed above, of which the ALJ mischaracterized and provided little discussion or analysis.

In sum, the ALJ's decision fails to set forth good reasons for discounting the opinion of Dr. Warren.  Accordingly, the Court finds a remand is necessary, thereby affording the ALJ the opportunity to sufficiently address the limitations assessed by Dr. Warren.

Finally, as this matter is being remanded[8] for further proceedings, and in the interests of judicial economy, the Court will not consider Mains' remaining[9] assignments of error.

## VII.   CONCLUSION

For the foregoing reasons, the Commissioner's final decision is VACATED and REMANDED for further proceedings consistent with this decision.

**IT IS SO ORDERED.**

                        _s/Jonathan D. Greenberg_
                        Jonathan D. Greenberg
                        United States Magistrate Judge

Date: March 21, 2019

---

[8]    The Court acknowledges Mains has requested, in the alternative to a remand, a "reversal and a finding of disability."  (Doc. No. 13 at 24.)  However, even if the ALJ were to assign Dr. Warren's opinion controlling or great weight it is not clear from the VE testimony that Mains would be found disabled.  Thus, the Court finds remand, rather than the outright reversal of the ALJ decision, to be more appropriate.

[9]    Mains' other assignments of error relate to the ALJ's (1) evaluation of the opinion of Dr. Brandstetter, Mains' treating psychiatrist and (2) the formulation of the RFC with respect to Mains' hemiplegic and chronic migraines.  (Doc. No. 13 at 1.)  As detailed above, the Court has concerns regarding the ALJ's treatment of Dr. Warren's opinion and the rather brief review of the evidence.  On remand, the ALJ should carefully consider Dr. Warren's opinion when formulating the RFC and also should conduct a more thorough review of the evidence when weighing Dr. Brandstetter's opinion.